HAROLD C. LUDWIG ET AL., APPELLEES, V. BOARD OF COUNTY
COMMISSIONERS OF SARPY COUNTY, NEBRASKA, ET AL.,
APPELLANTS.

103 N. W. 2d 838

Filed June 24, 1960.   No. 34746.

*Dixon G. Adams* and *Tesar & Tesar,* for appellants.

*LeRoy W. Weber* and *Smith & Smith,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Appellees, herein called plaintiffs, were allegedly residents, electors, and taxpayers in Sarpy County. They filed a petition for themselves and others similarly situated in the district court for said county against appellants, herein generally called defendants or designated by name. Plaintiffs' petition contained two causes of action. The first cause of action sought a declaratory judgment, and the second sought injunctive relief. The first, as far as important here, alleged in substance that the county was not under township organization, and contained more than 20,000 and less than 200,000 inhabitants when on November 4, 1958, the proposition of increasing Sarpy County commissioner districts from three to five was submitted to the electors of the county and carried, under the provisions of section 23-148, R. S. Supp., 1959, effective September 20, 1957, and section

23-149, R. R. S. 1943, and that thereafter, on December 29, 1958, the then county commissioners, Schram, Kostal, and Krist, who was thereafter succeeded in office by defendant Ely, purported to redistrict the county into five commissioner districts, as commanded by section 23-151, R. R. S. 1943. Plaintiffs alleged that in doing so, said defendants, then serving as county commissioners, failed and refused to comply with the mandatory provisions of said statute, which provides that each of the five districts shall consist of two or more voting precincts comprising compact and contiguous territory and embracing, as nearly as may be possible, an equal division of the *population* of the county.

Plaintiffs prayed that the purported redistricting by said defendants should be declared illegal, null, void, and of no effect; that the word "population" appearing in section 23-151, R. R. S. 1943, be held to include all persons who lived in the county on December 29, 1958; and that defendants be directed and required to lawfully comply with said statute.

Plaintiffs' second cause of action reiterated in substance the material allegations of their first cause of action; alleged that plaintiffs had no adequate remedy at law; and prayed for injunctive relief.

Defendants' answer, as far as important here, admitted that plaintiffs were residents, electors, and taxpayers of the county; that defendants Schram, Kostal, and Ely, who succeeded defendant Krist in office, are now the duly elected, qualified, and acting county commissioners; that at all times alleged the county was not under township organization and contained more than 20,000 and less than 200,000 inhabitants; and that on November 4, 1958, the proposition of increasing the commissioner districts from three to five was duly submitted to the electors of the county and carried. Defendants then denied generally and alleged that the county was redistricted as provided by law in an attempt to give the voters an equal voice in government; that in making re-

districting, equality of representation is not required to be mathematically exact; that defendants had a reasonable discretion which they exercised in good faith without ulterior motives or political consideration; that a disparity in the population of commissioner districts was unavoidable; and that the word "population" in the statute as applicable to Sarpy County means citizen population and not the personnel quartered at Offutt Air Force Base, hereinafter called Base, who are not legal residents of the county. Defendants prayed for dismissal of plaintiffs' petition and recovery of costs. Plaintiffs' reply was a general denial.

After a trial to the court whereat evidence was adduced, a judgment was rendered which found and adjudged the issues generally in favor of plaintiffs and against defendants; that the word "population" as used in section 23-151, R. R. S. 1943, and applicable to Sarpy County, means and should include all persons living in the county regardless of their business, occupation, civilian or military service, except only those persons living on the Base; that such statute requires, in the formation of districts, that they each embrace, as nearly as may be possible, an equal division of such defined population; that action of defendant county commissioners serving on December 29, 1958, in redistricting the county, including their official resolution and map then adopted and filed as parts of such action, although done in good faith, did not comply with said statute although it was possible to do so; and that each and all defendants' redistricting actions were invalid, null, void, and of no effect. Defendants were then enjoined from carrying out or attempting to carry out redistricting of the county as fixed and established on December 29, 1958, and defendant county commissioners thereafter serving as such were ordered to proceed forthwith to fix and establish five commissioner districts in conformity with section 23-151, R. R. S. 1943, and the court's judgment. Costs were taxed to Sarpy County.

Thereafter, defendants' motions for new trial were overruled and they appealed, assigning that: (1) The findings and judgment were not sustained by the evidence but were contrary thereto and contrary to law; and (2) in such respect the court erred in concluding that "population" as used in section 23-151, R. R. S. 1943, meant all persons living in the county, including Base and civilian military personnel, and their dependants who resided off the Base, and in concluding that in redistricting they should be counted in determining an equal division of the population of the county. We do not sustain defendants' assignments.

On the other hand, plaintiffs cross-appealed, assigning: (1) That the trial court erred in concluding that all persons living on the Base should not be counted in determining an equal division of population of the county; and (2) that the trial court erred in finding that the defendant county commissioners who voted for redistricting of the county on December 29, 1958, acted in good faith and in taxing costs to the county. We sustain plaintiffs' assignments.

As applicable here, section 23-151, R. R. S. 1943, provides in part: "Each county, not under township organization, having not more than two hundred thousand inhabitants, shall be divided into three districts numbered respectively, one, two and three, or into five districts as provided for in sections 23-148 to 23-150, which shall be numbered respectively, one, two, three, four and five; * * * and shall consist of two or more voting precincts, comprising compact and contiguous territory and embracing, as nearly as may be possible, an equal division of the population of the county and not subject to alteration oftener than once in four years. One commissioner shall be nominated and elected by each of said districts, but shall be elected by the qualified electors of the entire county in counties having a population in excess of one hundred thousand. * * * Provided, * * * in counties where a majority have voted for five commissioners, it

shall be the duty of the county board of such county, at their first meeting after the publication of the state or *federal census,* or after an election deciding to have five, to divide said county into five commissioner districts, as provided for by law; and provided further, the three commissioners of such county whose terms of office will expire after said election shall continue to represent the districts in which they reside after the redistricting of such county, until the expiration of the terms for which they were elected and until their successors are elected and qualified. At the general election next after the division of a county into five districts, one commissioner shall be elected for each of the two remaining districts." (Italics supplied.) For appointment of the two commissioners for the two commissioner district vacancies pending the next general election, see section 32-1040, R. R. S. 1943.

Concededly, this action is triable de novo as in equity upon an appeal to this court under rules heretofore too well established to repeat. The primary question presented is the meaning of "population" as used in section 23-151, R. R. S. 1943. In that connection, defendants contend that all those persons who were not legal residents or voters, whether military or civilian, and their dependents as well, and whether they lived either off or on the Base, should be excluded in determining the population of the county. In other words, defendants say in effect that since the act refers to such "qualified electors" in connection with election of commissioners, and "where a majority have voted for five commissioners," the word "population" was meant and intended to include only legal residents or voters living in the county and in each district, in which event the redistricting could be sustained. Defendants admitted, however, that if "population" included all persons, whether legal residents or not, living in the county, on December 29, 1958, then the redistricting would not be in conformity with law. On the other hand, plaintiffs argued that "popu-

lation" means the whole number of people living in the county on December 29, 1958, or when the redistricting is finally accomplished, and we agree.

Defendants' brief makes no contention that the county commissioners did not have a mandatory duty to comply with the provisions of section 23-151, R. R. S. 1943, or that plaintiffs had no right or authority to bring this action. Defendants, relying upon Niklaus v. Miller, 159 Neb. 301, 66 N. W. 2d 824, argued, as held therein, that: "It is presumed that a public administrative body acts in good faith, with honest motives, and for the purpose of promoting the public good and protecting the public interest." However, such presumption is rebuttable, and we conclude that it has been rebutted here. As held in Campbell Co. v. City of Harvard, 123 Neb. 539, 243 N. W. 653: "In absence of evidence showing misconduct or disregard of law, regularity of official acts is presumed." Also, as held in City of Scottsbluff v. Southern Surety Co., 124 Neb. 260, 246 N. W. 346: "In absence of evidence to the contrary, it may be presumed that public officers faithfully performed official duties."

Defendants' brief does not argue that the Base is not any part of Sarpy County, and there is no competent evidence that it is not. Rather, the official redistricting map of the county, attached to and made a part of the official resolution of the county commissioners redistricting the county, not only makes such Base a part of the county but also makes it a part of commissioner district No. 2, which is primarily involved in this case. Also, all other official maps of the county offered and received in evidence show that such Base is a part of the county. Further, section 22-177, R. S. Supp., 1959, effective September 18, 1955, which defines and fixes the boundaries of Sarpy County, does not exclude such Base as a part of the county, and we have not been cited or found any statute that does so, or authority for any conclusion that the Base is not a part of Sarpy County.

It will be noted that, contrary to defendants' contention, in counties such as Sarpy, which concededly has a population of less than 100,000, section 23-151, R. R. S. 1943, provides that: "One commissioner shall be nominated and elected by each of said districts," and "At the general election next after the division of a county into five districts, one commissioner shall be elected for each of the two remaining districts." Thus, the mere fact that one district may contain more legal residents or voters than another is not decisive because the five county commissioners, although "nominated and elected by each of said districts" do not represent only the electors of the county. They, as a board, represent and transact the county's governmental, administrative, and quasi-judicial affairs for and on behalf of the entire population of the county, that is, all of the people living in the county. Section 23-151, R. R. S. 1943, requires the county commissioners: "* * * at their first meeting after the publication of the state or federal census, or after an election deciding to have five, to divide said county into five commissioner districts, as provided for by law; * * *." Thus, a consideration of the federal census becomes important in this case.

In Armstrong v. Board of Supervisors, 153 Neb. 858, 46 N. W. 2d 602, we held that: "The courts of a state may take judicial notice of the population of a county created by it and of the counties therein in which a statute of the state is effective if its operation depends upon the existence of a specified population.

"The court in considering the meaning of a statute should if possible discover the legislative intent from the language of the act and give it effect.

"If the language of a statute is clear and unambiguous, courts will not by interpretation or construction usurp the function of the lawmaking body and give it a meaning not intended or expressed by the Legislature." In that opinion, referring to certain sections unimportant here, and citing numerous authorities, we said: "The

provisions of the statute are applicable to counties having thirty-six hundred inhabitants or more. The record is silent as to the population of Kearney County, but the courts of a state may take judicial notice of the population of a county created by it and of the counties wherein a statute of the state is operative, if its operation depends upon the existence of a specified population. * * * This court may, and does, take judicial notice of the fact that population of Kearney County is more than six thousand. * * * In considering the meaning and effect of these, the legislative intent must be discovered if possible from the language used considered in its plain, ordinary, and popular sense."

Also, with regard to the first holding above set forth, it is the general rule that it is proper as an aid for the court to present evidence with regard to which the court takes judicial notice. See, Buffalo County v. Bowker, 111 Neb. 762, 197 N. W. 620; State ex rel. Blessing v. Davis, 66 Neb. 333, 92 N. W. 740; Kokes v. State ex rel. Koupal, 55 Neb. 691, 76 N. W. 467. In the last-cited case, this court also held: "Courts will take judicial notice of a United States census and its results, a school census and its results; also of an authorized election and its results, and the number of votes cast thereat."

In 14 C. J. S., Census, § 1, p. 101, citing authorities, it is said: " 'Census,' in its ordinary meaning refers to an official enumeration of the population of a country or district; an official enumeration of the population of a country or of a city or other administrative district. In general, a census must be an official enumeration of the people, and, as such, a public record, containing not merely a sum total, but an official list, of the names of all the inhabitants preserved in the public archives and, except in so far as the statute under which it is taken prescribes otherwise, subject to public inspection."

In City of Twin Falls v. Koehler, 63 Idaho 562, 123 P. 2d 715, the court said, in speaking of the federal census:

"In other words, as above pointed out, the census is taken for the purpose of ascertaining, as a matter of fact, how many people were in a given municipality or state on the first day of April, 1940."

In City of Compton v. Adams, 33 Cal. 2d 596, 203 P. 2d 745, the court said: "A census has been defined as 'an official enumeration of the population of a country or of a city or other administrative district, generally with classified information relating to social and economic conditions.' (Webster's New Int. Dict. (2d ed.), 1941; see In re Cleveland's Claim, 72 Okla. 279 [180 P. 852, 855].)"

Also, in Excise Board, Washita County v. Lowden, 189 Okl. 286, 116 P. 2d 700, the court held: "A census bulletin officially issued, though a preliminary report, is a guide for official action in determining population."

The federal census includes all persons living in the county, including military and civilian employees quartered on or living off military installations, together with members of their families. In that connection, the 1950 Census of Population, vol. I, Number of Inhabitants, p. ix, published by the Bureau of the Census in 1952, and the 1950 Census of Population, vol. II, Characteristics of the Population, p. 2, published by the Bureau of the Census in 1953, both point out that: "In accordance with Census practice dating back to 1790, each person enumerated in the 1950 Census was counted as an inhabitant of his usual place of residence or usual place of abode, that is, the place where he lives and sleeps most of the time. This place is not necessarily the same as his legal residence, voting residence, or domicile, although, in the vast majority of cases, the use of these different bases of classification would produce identical results. * * * Persons in the armed forces quartered on military installations were enumerated as residents of the States, counties, and minor civil divisions in which their installations were located. Members of their families were enumerated where they actually resided. In the 1950

Census, college students living away from home were considered residents of the communities in which they were residing while attending college, rather than as persons temporarily absent from their parental homes as was the practice in 1940. * * * Inmates of institutions, who ordinarily live there for long periods of time, were counted as inhabitants of the place in which the institution was located; whereas patients in general hospitals, who ordinarily stay for a short time, were counted at, or allocated to, their homes."

In City of Bisbee v. Williams, 83 Ariz. 141, 317 P. 2d 567, the activation of a military installation resulted in an increase in the population of the city and such personnel were counted as part of such population. In the opinion it is said: "The word 'census' comes from the Latin verb 'censo', meaning 'to count or to reckon'. Most if not all of the states have statutes classifying cities and towns on the basis of population; providing quotas for the issuance of licenses; creation of judicial districts, and the like, based on population. Population is usually determined as the result of a census and it is true in the United States when one speaks of 'the census' the term has come to be understood as meaning the United States decennial census.

"Historically, in the Roman language census meant 'a numbering of the people'. Webster says that census is 'an official enumeration of the population of a country, or of a city or other administrative district.' "

The words "inhabitants" and "population" may have different meanings, depending upon the context in which they are used, and the intent of the act in which they appear, but they may be used interchangeably or synonymously, in a plain, ordinary, and popular sense. They are so used in the federal statutes requiring the taking of a federal census, and in the mandatory provisions of section 23-151, R. R. S. 1943. As generally used, "population" means the whole number of people or inhabitants living in a state, county, section, or area,

or the body of the inhabitants who live in a given local-
ity. See Bethel Township Veterans Home Assn. Liquor
License Case, 180 Pa. Super. 159, 119 A. 2d 613.

In State ex rel. Fairchild v. McCarthy, 257 Wis. 62,
42 N. W. 2d 484, speaking of inhabitants and popula-
tion, it is said: "These definitions are not conflicting
or inconsistent. When there is more than one resident
'inhabitant' in a municipality they constitute the 'popu-
lation;' and the definition of this word is, 'The whole
number of people or inhabitants in a country, section, or
area.' Webster's New International Dictionary (1948
ed.)."

In State ex rel. Blessing v. Davis, *supra*, this court
said: "The population of the county, as shown by the
United States census returns, was in 1890, 7,092 and in
1900, 7,390. The votes cast at the general election in
1890 were 1,515, and in 1900, 1,793. The school census
for the year 1899 was 2,863 and for the year 1900, 2,834.
With data of the character just mentioned, the question
is, what is the proper inference to be drawn as to the
total population on November 7, 1899? Was it 8,000 or
more, or less than that number? While the United
States census reports are not conclusive as to the true
population in any given territory, they afford very sat-
isfactory evidence of the fact in dispute, and unless
overcome by competent evidence of some other character,
should, we are satisfied, be accepted as prima-facie evi-
dence of the total population of the territory under con-
sideration."

It seems to us that such cases point out the fact that
population and legal residents or voting population are
different classifications. Apropos of such distinction, in
section 23-267, R. R. S. 1943, relating to supervisor dis-
tricts as distinguished from commissioner districts, the
number of inhabitants in a county is determined by mul-
tiplying the total number of votes cast therein at the
last general election by five, which indicates that the

Legislature did not confine inhabitants or population to legal residents or voters.

In Cram v. Chicago, B. & Q. Ry. Co., 85 Neb. 586, 123 N. W. 1045, 26 L. R. A. N. S. 1022, this court held that: "The legislature is presumed to know the general conditions surrounding the subject matter of legislative enactment, and it will be presumed it knows and contemplates the legal effect that accompanies the language it employs to make effective the legislative will."

The parent of section 23-151, R. R. S. 1943, is Laws of Nebraska, 1879, § 54, p. 369, which provides for three commissioner districts, each "embracing as near as may be possible one-third of the population of the county, * * *." If the Legislature, after having provided in different previous sections thereof for political action by "a majority of the legal voters," or "a majority of all the votes," or "the qualified voters," or "the qualified electors," or "two-thirds of the votes cast," had intended the county to be divided according to legal residents or voters, instead of population, it would have said so then or since, but it has continuously failed to do so for more than 80 years.

In other words, in the exercise of political power, nonresident voters are not entitled to participate or be considered or included, but the rights of all people as a part of the population of the county are entitled to be included in respect of administrative, quasi-judicial, or judicial functions which may come to have jurisdiction over the person and property of all persons living in the county. Cases relied upon by defendants involve political power or are based upon different statutory or constitutional provisions, and are distinguishable here.

It is generally the rule that: "The court will be slow to exercise its jurisdiction to set aside the redistricting of a county where it appears that the board by any exercise of sound discretion has effected that reasonable approximation to equality which is required by the statutory command that the districts shall con-

tain as nearly as practicable equal populations. A judicial question arises, however, whenever an act of reapportionment is clearly and palpably tainted with an abuse of discretion." State ex rel. South St. Paul v. Hetherington, 240 Minn. 298, 61 N. W. 2d 737. See, also, 20 C. J. S., Counties, § 40b, p. 794, and authorities cited therein.

As hereinafter observed, if military personnel and civilian employees of the Base who live both off and on the Base were excluded, as defendants would have us do, there would be a great disparity of population and unequal representation, because every person living in the county is entitled equally with all others to representation. The same would be true if only such military personnel and civilians who live off the Base were included, as ordered by the trial court. Either event would arbitrarily and unlawfully divide the county into districts without any proper regard to population of the county and districts. In that connection, it would be entirely illogical to include all those people who live off the Base and exclude the same classification of people who live on the Base.

The material facts are not generally in dispute. It is admitted that at all times involved here the county of Sarpy, having three county commissioners and not under township organization, had a population of more than 20,000 and less than 200,000 on November 4, 1958, when the proposition of increasing the county commissioner districts in the county from three to five was submitted to the electors and carried. Thereafter, upon notice given, a hearing was held on December 15, 1958, by the then three county commissioners for the purpose of redistricting the county into five commissioner districts as required by section 23-151, R. R. S. 1943. Thereat, numerous interested persons appeared, who, in representing themselves and improvement and taxpayers associations, presented five different plans, supported by

official maps of the county for making such redistricting.

On December 29, 1958, the county commissioners, who theretofore had the advice of counsel, adopted and filed a resolution and map purportedly prepared by the county attorney. Such map of the county simply designated the boundaries of each of the five districts as outlined and enumerated by a green pencil or chalk, without designating thereon or setting forth in the resolution the population of the county or any such district. The resolution itself simply described the boundaries of each district. One such commissioner testified that he did not recall who gave the county attorney the information put in the resolution or upon the map, and that no commissioner gave him any information as a directive. The county commissioners testified in substance that in connection with redistricting they acted in good faith without ulterior motives or political consideration. However, they admitted that they did not take any official action determining or fixing the population of the county or of the several districts on December 29, 1958, but that they simply adopted plan No. 2 presented to them on December 15, 1958, after slightly altering the boundaries of one district. Such plan excluded all military and civilian Base personnel living in the county. The commissioners testified that before redistricting, the board considered the advice of counsel; the advice theretofore given by an expert statistician hereafter mentioned; the five plans presented to them on December 15, 1958; the 1950 federal census; the 1958 school census; their personal knowledge; the official votes cast at the last general election; the ever-expanding industrial and housing construction in the county; the population growth of Papillion, Bellevue, and other parts of the county, some of which had become almost a suburb of Omaha; and their resolution of December 12, 1955, which determined the county's population to be 20,500 for the purpose of fixing salaries for county officials. The board did not

include or consider any military or civilian employees of the Base living on or off the Base in making the district apportionments. However, the boundaries of district No. 2, primarily involved here, did include both the city of Bellevue and the Base, together with some other adjacent territory.

In that connection, the record discloses that if the military personnel living on the Base were included, then district No. 1 had a population of 3,296, or 13.72 percent; *district No. 2 had a population of 12,226, or 50.89 percent;* district No. 3 had a population of 3,260, or 13.57 percent; district No. 4 had a population of 2,497, or 10.54 percent; and district No. 5 had a population of 2,744, or 11.28 percent, making a total population of 24,023. By excluding those people living on the Base, district No. 1 had a population of 3,296, or 17.03 percent; *district No. 2 had a population of 7,559, or 39.05 percent;* district No. 3 had a population of 3,260, or 16.85 percent; district No. 4 had a population of 2,497, or 12.90 percent; and district No. 5 had a population of 2,744, or 14.17 percent, making a total of 19,356. In either event, there would be a gross disparity of population in the respective districts.

The record admittedly discloses that on November 4, 1958, 4,769 votes for Governor were cast in the county. Out of that number, in Bellevue alone, which is located in proposed commissioner district No. 2, there were cast 1,229 votes. It will be observed that, counting resident voters alone, as defendants would have us do, there would still be a gross disparity of district population. The official school census of 1958 for the entire county was 19,480, excluding the Base personnel. The 1958 official school census for District No. 1, located in purported commissioner district No. 2, contained a total of 7,471. Also, the evidence discloses that part of school district No. 40, containing a population of 479, was made a part of commissioner district No. 2.

Plans Nos. 1 and 2, presented to the board on De-

cember 15, 1958, were substantially alike, and, as heretofore mentioned, the board adopted proposed plan No. 2. Exclusive of military and civilian employees of the Base living on and off the Base, plan No. 1 proposed commissioner district No. 1 with a population of 3,975; district No. 2 with a population of 6,000; district No. 3 with a population of 2,745; district No. 4 with a population of 2,851; and district No. 5 with a population of 2,724, which made a total county population of only 18,295. Likewise, plan No. 3 proposed commissioner district No. 1 with a population of 4,006; district No. 2 with a population of 3,605; district No. 3 with a population of 3,993; district No. 4 with a population of 3,913; and district No. 5 with a population of 3,950, which made a total county population of only 19,467. Likewise, plan No. 4 proposed commissioner district No. 1 with a population of 3,633; district No. 2 with a population of 3,486; district No. 3 with a population of 3,828; district No. 4 with a population of 4,320; and district No. 5 with a population of 4,200, making a total county population of only 19,467. Likewise, plan No. 5 proposed commissioner district No. 1 with a population of 3,032; district No. 2 with a population of 3,589; district No. 3 with a population of 3,034; district No. 4 with a population of 2,846; and district No. 5 with a population of 2,669, which made a total county population of only 15,170.

The discrepancies in the totals aforesaid are all less than the admitted population of the county, and arise by failure to include those military and civilian employees of the Base who lived in the county. The witness who presented plan No. 4 testified that about 65 percent of the population of the county lived east of U. S. Highway No. 73-75, with more than half of the county revenue coming from Bellevue and the eastern area of the county, with no one on the county board in such areas before redistricting, which was the primary reason for doing so.

An expert in the field of economics since 1950, who specialized in statistics and had, as chairman of the

Department of Business Research at the University of Nebraska for 13 years, made a scientific study of population estimates by employing methods promulgated and used by the Bureau of the Census, testified as a witness for plaintiffs. He took the 1950 population of Sarpy County as shown by the federal census to be 15,693, and changes occurring between 1940 and 1950 and thereafter, and by the use of several long, well-recognized different variables, developed a technique known as correlation for determining the current population of small areas. He had prepared the estimated population of Nebraska counties, as published by the University of Nebraska, in April 1959, which shows Sarpy County with a population of 15,693, in conformity with the 1950 federal census, and estimated that Sarpy County had a population of 22,723 in 1956, and 26,343 in 1958, with the city of Bellevue having a population of 3,858 in 1950, and 8,419 in 1958. The county board had used the advice and conclusions of that same witness when it increased the population of the county to 20,500 in 1955.

Some adult Base military and civilian employees who live off Base own their homes and trailers. Some such personnel pay taxes in the county and some actually are legal residents and voters in the county. Personnel living off and on Base own transportation facilities, buy car and driver licenses in the county, use its governmental, administrative, quasi-judicial, and judicial services and facilities, and enhance the economy. Of course, the children of military personnel who live off and on Base attend public schools in the county. See §§ 79-446 and 79-447, R. R. S. 1943, now §§ 79-446 and 79-447, R. S. Supp., 1959, effective September 28, 1959. All Base military and civilian employees living off and on Base, and their dependents as well, regardless of age or sex, are entitled, as a part of the county's population, to use the county's facilities aforesaid and be represented by the county board. True, the number of such personnel fluctuates some from time to time, but the number of

civilian population likewise fluctuates from time to time. In such respect, the 1950 federal census shows that the county then had a population of 15,693, which had increased to 31,263, including 4,884 Base personnel and their dependents, as shown by the preliminary report of the 1960 federal census, of which we take judicial notice.

The evidence discloses that if only the military and civilian Base personnel living off Base were required to be counted, then on December 29, 1958, commissioner district No. 2 would contain more than twice the percentage of population in any other district, which would be a grossly unequal apportionment and not any compliance with section 23-151, R. R. S. 1943. On the other hand, if the military and civilian Base personnel living on Base were also required to be counted, then commissioner district No. 2 would contain about one-half of the county's population, which defendants admit would not be any compliance with said statute.

The trial court was correct in determining that the word "population" used in section 23-151, R. R. S. 1943, embraces and includes all persons living in the county, regardless of their age, sex, business, occupation, or military or civilian service, who live off Base. However, the trial court erred in excluding all such persons living on Offutt Air Force Base. In other words, the trial court properly held that the redistricting of December 29, 1958, was illegal, void, and of no force and effect, and properly enjoined its enforcement. However, the court should have directed the county board to redistrict the county as required by section 23-151, R. R. S. 1943, which it is possible to do, after determining the population, including all persons living off and on Base and all other persons living in the county, in conformity with this opinion, not as of December 29, 1958, but as of the date when the redistricting is finally accomplished. In that connection, the redistricting should now be accomplished after taking into consideration the 1960 fed-

eral census and such other related competent evidence as may be presented to the board.

Plaintiffs by cross-appeal also assigned and argued that the trial court erred in finding that defendant commissioners acted in good faith, and that the trial court erred in taxing costs to the county. We agree. The costs should have been all taxed to defendants Schram, Kostal, and Krist, who were county commissioners on December 29, 1958, and who then failed and refused to comply with the statute, as they were required to do. The county was not a party in this action. We have been cited no authority, and upon diligent search have found none, which could justify taxing costs to the county, which was not a party to the litigation.

In that connection, section 25-1711, R. R. S. 1943, provides: "In other actions the court may award and tax costs, and apportion the same between the parties on the same or adverse sides, as in its discretion it may think right and equitable." It deals solely with parties in the action. Also, section 25-1933, R. R. S. 1943, deals solely with such parties, and provides: "When a judgment, decree or final order is reversed, vacated or modified, the court may render judgment for all costs against the appellee or appellees or some of them, or may direct that each party pay his own costs or apportion the costs among parties or direct that judgment for costs abide the event of a new trial as, in its discretion, the equities of the cause may require."

In 14 Am. Jur., Costs, § 37, p. 24, citing numerous authorities, it is said: "When, however, a public official has been guilty of misfeasance, nonfeasance, or negligence in fulfilling the duties of office imposed on him by law, he is liable for the costs of an action or proceeding brought to remedy the wrong to the same extent that any other individual wrongdoer would be liable for costs." We cannot conclude that defendants were not guilty of misfeasance, nonfeasance, or negligence. Rather, we conclude that they were. To tax

costs herein to plaintiffs would be an abuse of legal discretion and a grave injustice.

We conclude that the judgment of the trial court should be and hereby is affirmed in part and in part reversed, and said cause is hereby remanded with directions to render a judgment in conformity with this opinion. All costs are taxed to the three defendants heretofore named, who were county commissioners on December 29, 1958.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.